**MOSS MANUFACTURING CO., INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 85–04–00593.**

United States Court of International Trade.

May 22, 1989.

---

Peter S. Herrick, Miami, Fla., for plaintiff.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., Joseph I. Liebman, Atty. in Charge, New York City, Intern. Trade Field Office, Kenneth N. Wolf, Mark Sochaczewsky and Judith M. Barzilay, New York City, for defendant.

## OPINION

CARMAN, Judge:

Plaintiff, Moss Manufacturing Co., Inc. (hereinafter Moss or buyer), commenced this action pursuant to 28 U.S.C. 1581(a) (1982), contesting defendant United States Customs Service's (Customs) appraisal of certain ceiling fans it imported from Taiwan. Moss contends that Customs improperly overstated the appraisal by including monies Moss disbursed to the seller, C.E.C. Electrical Manufacturing Co. (hereinafter CEC or seller), for later payment to Moss's buying agent DMZ Offshore Services, Ltd. (hereinafter DMZ or buying agent). Moss claims that these disbursements to the seller were commissions for the buying agent's services and should not have been included as part of the transaction value upon which duties are levied under section 402(b) of the Tariff Act of 1930 as amended by Title II of the Trade Agreements Act of

1979, 93 Stat. 194. 19 U.S.C. § 140la(b) (1982).

Moss argues that the dutiable value is the price actually paid or payable exclusive of the alleged buying commission even though the buying commission was paid to the buying agent indirectly, by including it in the amount paid to the seller. Moss alleges the monies it disbursed to the seller CEC for later payment to Moss' buying agent DMZ, was a *bona fide* buying commission and not for the benefit of the seller. Consequently, Moss argues, it should have been excluded from the calculation of the transaction value for appraisal purposes. Moss seeks judgment ordering a refund of duties and a holding that transaction value as defined in section 402(b), does not include buying commissions paid to the seller for remittance indirectly to the buying agent.[1]

Customs asserts that Moss has failed to overcome the presumption of correctness which attaches to Customs appraisals, since it failed to establish that the appraisal and the assessment of duties by Customs were erroneous. Customs contends that the monies dispersed to the seller for remittance to the buyer's agent were properly included in the transaction value under section 402(b) because the disbursements were part of the total payment made to the seller CEC. Customs seeks to dismiss the action.

At issue is Customs' interpretation of section 402(b) of the Tariff Act of 1930 as amended. The parties agree that the proper statutory basis of appraisal is transaction value as defined in section 402 of the Act, the pertinent part of which states:

**§ 1401a. Value**

**(a) Generally**

(1) Except as otherwise specifically provided for in this chapter, imported merchandise shall be appraised, for the purposes of this chapter, on the basis of the following:

---

**1.** In the complaint Moss also alleged that inland freight charges and other services incident to the international shipment of the merchandise were also improperly included in the calculation of the appraised value. Complaint at ¶¶ 18–24. Moss claimed that Treasury Decision 84–235 is applicable to the valuation of their entry. *Customs Regulations Amendment Relating to Valuation of Imported Merchandise*, 49 Fed.Reg. 46,886 (Nov. 29, 1984) (hereinafter Treasury Decision). The Treasury Decision amended prior Customs practice to conform Customs regulations to the Agreement on Implementation of Article VII of the GATT. The new customs regulation amended prior practice to exclude, rather than include, from the price paid or payable for imported merchandise, the costs for foreign inland freight and other services incident to the international shipment of merchandise which occur after the goods have been sold for export to the United States and are placed on a carrier for through shipment. 49 Fed.Reg. at 46,886; 19 C.F.R. § 152.103(a)(5) (1985).

At trial Moss appeared to have abandoned this argument. Moss' counsel mentioned in his opening argument that

[a]s set forth in the Treasury decision we made reference to in the complaint, the fact that the merchandise is packed ready for shipment at the exporter's premises, and when the bill of lading is created it's a true bill of lading from that point to the United States, and under current interpretation of inland freight and, on that basis it's a non-dutiable charge.

Trial Transcript at 8 (hereinafter Tr.). The only other reference to this claim occurred at the end of Customs' cross-examination of Monroe Zalkin when the Court engaged the witness in the following exchange:

THE COURT: Let's talk about the inland freight problem for just a moment. Have you ever paid separately for any kind of inland freight charges?

THE WITNESS: I don't know for sure, but I would speculate if there were inland freight charges, it was included in the letter of credit that the Hong Kong office pays, usually a small charge. It's a charge for hauling it from the vendor down to the dock.

THE COURT: Do you recall offhand if, on the commercial invoices that you received which are ... represented by Plaintiff's Exhibit 1 in evidence showed separate costing passed onto Moss for inland freight?

THE WITNESS: I don't think they broke it out separately.

Tr. at 60–61.

The only other evidence pertaining to this claim was contained in Joint Exhibit 1, the original entry papers filed with Customs. It appears that included with the commercial invoice, consumption entry form, and the pro forma invoice, there was also a Carrier's Certificate which referred to a bill of lading for the merchandise subject to this protest. However, there is no other readily apparent explanation in the record which establishes that Customs improperly included charges for inland freight or other services incident to international shipment in its appraisal. Consequently, the Court finds the claim to be meritless.

(A) The transaction value provided for under subsection (b) of this section.

\*　\*　\*　\*　\*　\*

**(b) Transaction value of imported merchandise**

(1) The transaction value of imported merchandise is the price actually paid or payable for the merchandise when sold for exportation to the United States....

\*　\*　\*　\*　\*　\*

(4) For the purposes of this subsection—

(A) The term "price actually paid or payable" means the total payment (whether direct or indirect, and exclusive of any costs, charges, or expenses incurred for transportation, insurance, and related services incident to the international shipment of the merchandise from the country of exportation to the place of importation in the United States) made, or to be made, for imported merchandise *by the buyer to, or for the benefit of,* the seller.

19 U.S.C. § 1401a (emphasis added).

This Court must determine whether monies which were disbursed by the buyer to the seller with directions from the buyer to remit the monies to the buyer's agent, who assisted in bringing about the sale, were properly included in the transaction value for the purposes of appraisal by Customs under the terms of the statute.

On the basis of the evidence elicited at trial, the arguments of the parties, the relevant case law and all other papers submitted herein, the Court finds that Moss has not overcome the presumption of correctness which attaches to Customs' appraisal. Consequently, this Court affirms Customs' valuation of the merchandise.

## THE TRIAL

The evidence in this case revealed that Moss imported 1,165 ceiling fans from the seller, CEC, in Taiwan and that CEC is a manufacturing firm entirely unrelated to Moss. Pretrial Order at 9 (Stipulations); *see also,* Plaintiff's Exhibit 8 (hereinafter P.Ex.). The merchandise was appraised by Customs at values higher than the entered and invoiced values submitted by Moss for the merchandise. The valuation determined in the appraisal and the liquidation included, in addition to the invoiced values, an amount of $1,747.50 described as "brokerage fees." Pretrial Order at 9–10. These brokerage fees were the amounts paid by the buyer to the seller with instructions from the buyer to the seller to disburse the money to the buyer's agent who assisted in bringing about the sale.

At the trial the testimony of plaintiff's sole witness Monroe Zalkin, (Moss' president and chief executive officer), and eleven exhibits (nine submitted by plaintiff, one by the defendant and one as a joint exhibit) were presented. The evidence showed that Moss, the buyer, established DMZ as a separate entity in Hong Kong to source merchandise, negotiate prices and freight rates and otherwise represent Moss in the Far East. Tr. at 12.

A buying agency agreement entered into by the buyer Moss and its agent DMZ was filed with Customs. Tr. at 15. The agreement provided that the "buying commission and other charges shall be listed separately on the commercial and special Customs invoices prepared by the Agent." P.Ex. 4 at ¶ 5 (buying agency agreement); Tr. at 15, 32. Contrary to this agreement, the commercial invoice included with the official entry papers did not identify a payment of $1,747.50 or any other payment as a buying commission, brokerage fee or any other charge. P.Ex. 1.

In order to pay for the ceiling fans, Moss opened a letter of credit with Standard Charter Bank of Miami, Florida in favor of the seller CEC. P. Exs. 3, 5. Under the terms of the letter of credit $41,555.50 was to be paid to the seller for the 1,165 ceiling fans. The letter of credit required CEC, the seller of the merchandise, to remit $1.50 per fan ($1,747.50) to DMZ, the buyer's agent. P.Ex. 5. The letter of credit did not indicate the nature of the required payment from the seller CEC to the buying agent DMZ.

Zalkin testified that the banks issuing Moss' letters of credit requested Moss to make its payments to its buying agents in

this fashion, and apparently Moss routinely employed this procedure. Tr. at 17, 18, 34. Zalkin stated that in the case at bar "we includ[ed] the buying commission and the cost of the goods and instructed the vendor [CEC] [to] remit the buying commission to our DMZ office." Tr. at 34. Zalkin further explained this arrangement: "The bank wanted us to do it in that way. It would have been easier to pay our company in Hong Kong directly but the bank wanted everything included in the invoice." Tr. at 18. Perhaps this indirect manner of payment was utilized because the banks refused to finance the buying commissions directly due to their small amounts. *See,* Defendant's Exhibit A at 20. Moss introduced into evidence a receipt acknowledging the transfer of proceeds in the amount of $1,747.50 to the account of the buying agent DMZ but the receipt did not specify the source of the funds credited to the account. P.Ex. 7.

The evidence further showed that the seller CEC invoiced Moss $40,510.50 for the 1,165 ceiling fans. Moss submitted this commercial invoice to Customs with its official entry papers. P.Ex. 1; Tr. at 15. The commercial invoice listed the quantity, unit and total prices for three different models of ceiling fans, and the total amount of the purchase price, but failed to specify any breakdown for buying commission fees, inland freight or any other charges. P.Ex. 1. The pro forma invoice prepared by Moss, also submitted to Customs as part of the entry documentation, indicated a total payment to the seller CEC of $41,555.50, with a breakdown of $1,747.50 denominated as "Brokerage, Inspection Service Fee required to be remitted to [DMZ]." Joint Exhibit 1; P.Ex. 2.[2]

## Discussion

■■■ Moss has an additional burden since the appraisal decision of the Customs official and the assessment of duties pursuant to such decision are considered presumptively correct. 28 U.S.C. § 2639(a)(1) (1982); *Jarvis Clark Co. v. United States,* 2 Fed.Cir. (T) 70, 72, 733 F.2d 873, 876 (1984). The proper statutory basis of appraisal is transaction value, as defined and described in section 402(b) of the Tariff Act of 1930. 19 U.S.C. § 1401a(b). "The starting point in every case involving construction of a statute is the language itself." *Madison Galleries, Ltd. v. United States,* 870 F.2d 627, 629 (1989) (citing, *Bethesda Hosp. Ass'n v. Bowen,* 485 U.S. 399, 108 S.Ct. 1255, 1258, 99 L.Ed.2d 460 (1988); *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981); *Watt v. Alaska,* 451 U.S. 259, 265, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981)). Absent a clear cut legislative intent contrary to the statutory language, the statutory language is ordinarily regarded as conclusive. *Id.*

■■■ Transaction value is "the price actually paid or payable for the merchandise when sold for exportation to the United States," plus certain enumerated items not in issue here.[3] 19 U.S.C. § 1401a(b)(1). The "price actually paid or payable" is defined as "the total payment (whether direct or indirect ...) made, or to be made, for imported merchandise by the buyer *to,* or *for the benefit of,* the seller." 19 U.S.C. § 1401a(b)(4) (emphasis added). It appears to this Court that the statute is unambiguous. According to its plain language, it is clear payments made to the seller by the buyer for the benefit of the seller must be included in the price paid or payable for the purpose of valuation. This Court holds where a payment for goods is made to a seller with instructions to disburse part of

---

**2.** There were discrepancies between the unit prices and the total prices on the commercial invoice provided by the seller CEC and the pro forma invoice provided by Moss which were never adequately explained. Zalkin conceded he could not explain the discrepancy between the unit prices on the CEC invoice and the pro forma invoice. Tr. at 51. The Court notes that the unit prices on the pro forma invoice prepared by Moss were undervalued by an amount that equalled the figure listed on the pro forma invoice as a brokerage fee ($1,747.50)—the amount in dispute in this action.

**3.** *See,* 19 U.S.C. § 1401a(b)(1)(A)–(E), for the enumerated additions to the price paid or payable (e.g. packing costs, selling commissions, assists, royalty fees, etc.).

such funds to the buyer's agent, where the agent assisted in bringing about the sale, such disbursement constitutes a disbursement for the benefit of the seller within the meaning of 19 U.S.C. § 1401a(b) and is properly included within the price paid for purposes of valuation. Although the disbursement similarly benefits the buyer, this does not detract from the benefit to the seller. This conclusion appears consistent with prior case law and legislative enactments.

In 1979 Congress substantially overhauled the basis of valuation of imported merchandise to implement agreements reached during the Tokyo Round of Multilateral Trade Agreements conducted under the auspices of the General Agreement on Tariffs and Trade. The Trade Agreements Act of 1979 amended section 402 of the Tariff Act of 1930 to change the basis of valuation from export value to transaction value. *Compare,* section 402(a) and (b) of Title IV of the Customs Simplification Act of 1956, 70 Stat. 943, (19 U.S.C. § 1401a(a) and (b) (1976)) (defining export value), with Title II of the Trade Agreements Act of 1979, 93 Stat. 194 (19 U.S.C. § 1401a(a) and (b) (1982)) (defining transaction value).

*Inter alia,* the Trade Agreements Act made two important additions to the prior statute. The definition of transaction value explicitly included selling commissions as a part of dutiable value. 19 U.S.C. § 1401a(b)(1)(B). Payments made for the "benefit of the seller" were also explicitly included in the definition of the price paid or payable for the merchandise and therefore subject to duties. 19 U.S.C. § 1401a(b)(4). Though the legislative history is silent as to their origin, these additions, along with other changes, appear to be the statutory incorporation of years of Customs Courts holdings. *See,* S.Rep. No. 249, 96th Cong., 1st Sess. 114–23, *reprinted in* 1979 U.S.Code Cong. & Admin. News 381, 500–509. In any event, these amendments were not inconsistent with prior judicial construction concerning the dutiability of commissions. *Compare,* e.g., *Dorf Int'l, Inc. v. United States,* 61 Cust.Ct. 604, 611, A.R.D. 245, 291 F.Supp. 690, 695 (1968) (selling commission dutiable under statute defining export value) with *Jay–Arr Slimwear, Inc. v. United States,* 12 CIT ——, ——, 681 F.Supp. 875, 878 (1988) (selling commission dutiable under transaction value statute); *J.C. Penney Purchasing Corp. v. United States,* 80 Cust.Ct. 84, 95, C.D. 4741, 451 F.Supp. 973, 982 (1978) (buying commission not dutiable under export value) with *Rosenthal–Netter, Inc. v. United States,* 12 CIT ——, ——, 679 F.Supp. 21, 23, *aff'd,* 861 F.2d 261 (Fed.Cir. 1988) (buying commission not dutiable under transaction value).

■ It is settled law under either statutory scheme that a *bona fide* buying commission is excludable from dutiable value when the commission is paid directly to the agent. *Rosenthal–Netter, Inc.,* 12 CIT at ——, 679 F.Supp. at 23 (citing, *United States v. Nelson Bead Co.,* 42 CCPA 175, 183, C.A.D. 590 (1955); *J.C. Penney,* 80 Cust.Ct. at 95, 451 F.Supp. at 982). By contrast under both statutes selling commissions have been uniformly found to be within the ambit of dutiable value. *See, e.g., Dorf Int'l, Inc.,* 61 Cust.Ct. at 611, 291 F.Supp. at 695; 19 U.S.C. § 1401a(b)(1)(B). Whether a commission is a *bona fide* buying commission depends in each instance on the facts of each particular case. *J.C. Penney,* 80 Cust.Ct. at 95, 451 F.Supp. at 983; *Nelson Bead Co.,* 42 CCPA at 183. One court has noted that the distinction between a buying and a selling commission is "whether the expense is associated with selling or producing the merchandise, rather than some ministerial function in procuring the goods." *Jay–Arr Slimwear, Inc.,* 12 CIT at ——, 681 F.Supp. at 878 (citing, *Norco Sales Co. v. United States,* 65 Cust.Ct. 778, 782, R.D. 11732, 319 F.Supp. 1399 (1970)).

■ Plaintiff has the burden of proving both the existence of the principal-agent relationship as well as that the monies paid were, in fact, *bona fide* buying commissions. *Rosenthal–Netter,* 12 CIT at ——, 679 F.Supp. at 23 (and cases cited therein). "The bedrock upon which the *bona fides* are based is the establishment of the buying agency relationship with re-

spect to the subject transaction." *United States v. Manhattan Novelty Corp.*, 63 Cust.Ct. 699, 702, A.R.D. 263 (1969). The threshold question is the "right of the principal to control the agent's conduct with respect to the matters entrusted to him." *J.C. Penney*, 80 Cust.Ct. at 95, 451 F.Supp. at 983. However, in deciding whether an alleged agency relationship is *bona fide* the Court must examine all relevant factors. *Rosenthal–Netter*, 12 CIT at ——, 679 F.Supp. at 23.

These factors include: the right of the principal to control the agent's conduct; the transaction documents; whether the importer could have purchased directly from the manufacturers without employing an agent; whether the intermediary was operating an independent business, primarily for its own benefit; and, the existence of a buying agency agreement. *Id.* This Court is satisfied that based upon an examination of these factors Moss conclusively established that DMZ was its *bona fide* buying agent.

■ However, the importer's establishment of the agency relationship with its buying agent does not end the inquiry. In order for the disbursement from the seller to the buyer's agent to be exempt from dutiable value, the importer must additionally show that "none of the commission inures to the benefit of the manufacturer." *J.C. Penney*, 80 Cust.Ct. at 97, 451 F.Supp. at 984; *see also, Manhattan Novelty Corp.*, 63 Cust.Ct. at 702; *Nelson Bead Co.*, 42 CCPA at 183; *United States v. Knit Wits (Wiley)*, 62 Cust.Ct. 1008, 1011, A.R.D. 251, 296 F.Supp. 949 (1969); *Carolina Mfg. Co. v. United States*, 62 Cust.Ct. 850, 854–55, R.D. 11640 (1969); *New Trends Inc. v. United States*, 10 CIT 637, 643, 645 F.Supp. 957, 962 (1986).

## CONCLUSION

This Court determines the plaintiff has not overcome the presumption that the appraisal decision of the Customs official and the assessment of duties pursuant to that decision were presumptively correct. For the reasons set forth above, this Court holds where the payment for goods was made to the seller with instructions to disburse part of such funds to the buyer's agent, and where the agent assisted in bringing about the sale, the disbursement constituted monies expended for the benefit of the seller within the meaning of 19 U.S.C. § 1401a(b). The disbursement was properly included as part of the price paid for the purposes of appraisal valuation establishing the transaction value upon which duties were levied. The Customs appraisal of the merchandise and the assessment of duties thereunder is affirmed. This action is dismissed.