**MOSS MANUFACTURING CO., INC.,**
**Plaintiff–Appellant,**

v.

**The UNITED STATES,**
**Defendant–Appellee.**

No. 89–1544.

United States Court of Appeals,
Federal Circuit.

Feb. 13, 1990.

Peter S. Herrick, Miami, Fla., argued for plaintiff-appellant. With him on the brief was Fred P. Bingham, III.

Joseph I. Liebman, Attorney in Charge, International Trade Field Office, New York City, argued for defendant-appellee. With him on the brief were Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director and Kenneth N. Wolf.

Before BISSELL,* ARCHER and MAYER, Circuit Judges.

MAYER, Circuit Judge.

## OPINION

Moss Manufacturing Company, Inc. (Moss) appeals the judgment of the United States Court of International Trade affirming the United States Customs Service's (Customs) appraisal for duty purposes of a single entry of ceiling fans. *Moss Manufacturing Co., Inc. v. United States*, 714 F.Supp. 1223 (Ct.Int'l Trade 1989). We affirm.

### Background

Moss is an American company engaged in the buying and importation from the Far East of merchandise for resale in the United States. To facilitate transactions between itself and the foreign sellers and manufacturers with whom it deals, in 1981 Moss established D.M.Z. Offshore Services, Ltd. (DMZ) as an independent entity to function as its agent in the Far East. DMZ's responsibilities in this capacity in-

---

* Judge Bissell, who died on February 4, 1990, did not participate in the consideration or decision of this case.

clude sourcing merchandise, negotiating prices and freight rates, and entertaining Moss' customers who visit the Far East. In exchange for these services, the agency agreement between them obligates Moss both to reimburse DMZ for any fees and costs incurred in facilitating a transaction and to pay DMZ a "buying commission".

The method of calculation and manner of payment of DMZ's commissions varied from transaction to transaction and year to year. Moss' primary objective in negotiating the commissions was to insure that, in any given year, their sum be sufficient to fund the operation of DMZ's offices in Hong Kong. As a consequence, Moss did not report the buying commissions to Customs in a consistent manner. In particular, at least until October of 1983, Moss paid DMZ commissions only on selected transactions; those commissions Moss did pay, even thereafter, were included variously as part of the "price paid", reported separately, or omitted altogether on Customs entry documents. This inconsistent treatment triggered, in 1985, a thorough Customs review of several hundred Moss entries over the preceding few years. The entry at issue here, which occurred in September of 1983, is one of those chosen for review. The parties have selected it as a "test case" pursuant to the rules of the Court of International Trade; that court has stayed three other actions between the same parties pending decision in this case.

This transaction involved the purchase by Moss of several sets and types of ceiling fans. By an undated "pro forma" invoice from Moss to C.E.C. Electrical Manufacturing Co., Ltd. (CEC), Moss ordered 1165 ceiling fans with a total price of $39,808.00. The invoice included an additional sum of $1,747.50, denoted as "Brokerage, Inspection Service Fee required to be remitted to DMZ Hong Kong Services, Ltd.". Thus, the total amount of the pro forma invoice was $41,555.50.

To pay for the merchandise, Moss applied for and received from Standard Chartered Bank of Miami, Florida (Standard Bank), a letter of credit for the same amount. However, the letter of credit re-

cited only the aggregate amount of $41,-555.50 and an "invoice value" of $39,808.00, together with the instruction that the beneficiary (CEC) remit $1.50 per fan to a second bank in Hong Kong to the account of DMZ. The effect of this condition would be the same as if Moss were to pay $1,747.50 directly to DMZ, but the alleged "commission" was not separately identified in the letter of credit and the letter gives no indication of what the $1.50 per fan payment was for. Moss' president and chief executive officer testified that DMZ was paid in this way because Standard Bank demanded it: the bank wanted all payments related to the transaction included in a single letter of credit.

CEC accepted, filled, and shipped Moss' order for 1165 fan sets. However, there were several significant discrepancies between the accompanying commercial invoice, dated September 26, 1983, and the pro forma invoice prepared by Moss. Most importantly, the total prices differed—$40,-510.50 versus $39,808.00—and the commercial invoice did not identify any portion of the total amount or any separate amount as a "buying commission", "brokerage fee", or the like. Second, the unit price for each of the three types of fans ordered was higher on the commercial invoice. Finally, CEC erroneously shipped 480 five-bladed fans of a certain style instead of the 480 four-bladed fans of that style ordered by Moss.

Nevertheless, Moss accepted the shipment and under the letter of credit Standard Bank paid CEC the total commercial invoice price plus the $1.50 per fan "commission". The record contains a "Negotiating Bank Certificate" indicating that DMZ was in turn paid the $1.50 per fan amount required by the letter of credit, but the certificate is silent about the source of the funds. The total amount paid by Standard Bank, $42,258.00, exceeded the amount stated in the letter of credit by $702.50.

Based on the entry documentation, which included both the pro forma and commercial invoices as well as a copy of the Moss/DMZ agency agreement, Customs appraised the value of the entry for duty

purposes at the full $42,258.00. Moss protested that the appraisal was incorrect because it included the $1.50 per fan "buying commission" indirectly remitted to DMZ. Such a commission, Moss argued, does not constitute part of the price paid "for the merchandise" and is therefore not includable in the "transaction value" upon which Customs bases its duty appraisals.

The Court of International Trade disagreed. It held that where the seller is responsible for disbursing a portion of the total payment to a buying agent who "assisted in bringing about the sale", that portion is money expended for the benefit of the seller, is properly includable as part of the price paid for the goods, and hence is part of the transaction value. 714 F.Supp. at 1229. The court concluded that Moss had not overcome the presumption of correctness, 28 U.S.C. § 2639(a)(1) (1982), that attached to Customs' appraisement. 714 F.Supp. at 1229. Moss appeals.

*Discussion*

■ Moss erroneously assumes the premise of its argument, a factual finding that the Court of International Trade was careful *not* to make: that the $1.50 per fan payment to DMZ was a bona fide buying commission. The court's deliberate characterization of the $1,747.50 as a "payment" or "disbursement" rather than "commission" is not mere semantics; it underscores the principle that not even all *direct* payments from a buyer to a bona fide buying agent are bona fide buying commissions. A buyer like Moss "has the burden of proving the existence of a bona fide buying agency *and* that the charges paid were, in fact, bona fide buying commissions" before those commissions can be considered for exclusion from dutiable value. *Rosenthal–Netter, Inc. v. United States*, 679 F.Supp.

21, 23 (Ct.Int'l Trade) (emphasis added), *aff'd*, 861 F.2d 261 (Fed.Cir.1988).**

■ Moss succeeded in proving the former but not the latter. The court agreed that "Moss conclusively established that DMZ was its bona fide buying agent", 714 F.Supp. at 1229, but it did not similarly resolve the conflicting evidence on the nature of the $1,747.50 payment in Moss' favor. In particular, the court found that the discrepancies described above between the pro forma and commercial invoices "were never adequately explained". *Id.* at 1227 n. 2. Moss itself conceded that the higher price shown on the commercial invoice was only "mainly" explainable on the basis of CEC's erroneous shipment of five-instead of four-bladed fans. Moss' president admitted that an increase in the price of brass also might have contributed to the higher commercial invoice price. In light of the additional facts that DMZ apparently never prepared any invoices of its own, as required by the Moss/DMZ agency agreement, separately listing its buying commission and other charges; and that the bank certificate acknowledging receipt by DMZ of $1,747.50 does not specify from whom the payment came or for what it was intended, the trial court's conclusion that Moss had not carried its burden of proving that the disputed amount was a bona fide buying commission is amply supported by the evidence.

In any event the Court of International Trade recognized that whether a payment properly may be characterized as a "buying commission" as such is no longer relevant for the purposes of determining its liability to duty. Appraisal for duty purposes is now based on "transaction value", defined as the "price actually paid or payable for the merchandise when sold for exportation

** Dicta in *Rosenthal–Netter* suggests, and the Court of International Trade here apparently agreed, *see* 714 F.Supp. at 1228, that bona fide buying commissions are per se non-dutiable under the post–1979 "transaction value" scheme of appraisement (as they were under the prior "export value" scheme). We need not reach this issue. Moss has failed to establish that the $1,747.50 payment here is a bona fide buying commission. Moreover, since the term "buying

commission" does not appear in the current statutory scheme, pigeonholing certain payments as such is of no avail to buyers like Moss. Monies paid to agents like DMZ are non-dutiable only if they do not otherwise fit within the definitions of statutorily relevant terms like "price paid or payable", upon which "transaction value" for appraisal purposes is based. *See infra.*

to the United States...." 19 U.S.C. § 1401a(b)(1) (1982). The statute in turn defines "price actually paid or payable":

The term "price actually paid or payable" means the total payment (whether direct or indirect, and exclusive of any costs, charges, or expenses incurred for transportation, insurance, and related services incident to the international shipment of the merchandise from the country of exportation to the United States) made, or to be made, *for imported merchandise by the buyer to, or for the benefit of, the seller.*

*Id.* § 1401a(b)(4)(A) (emphasis added). Moss devotes virtually all of its argument to an explanation of how a bona fide buying commission cannot constitute a payment "for the merchandise" within the meaning of this statute. But as noted above, this misses the point for two reasons: it assumes the disputed payment was in fact a bona fide buying commission and it treats this nonexistent finding as critical. The Court of International Trade clearly said that the payment was "for goods", 714 F.Supp. at 1227; on this record, we see no reason to question that statement. Therefore, whether a bona fide buying commission constitutes a payment "for merchandise" within the meaning of the statute is a question we need not decide.

■ The second requirement for a payment to come within the definition of "price paid or payable" is that it be to *or* for the benefit of the seller. Neither party disputes that the payment involved here was made "to" the seller and the Court of International Trade assumed this fact. *Id.* When combined with the court's conclusion that the payment was "for goods", this fact is sufficient to render the payment dutiable under 19 U.S.C. § 1401a(b)(4).

■ Nevertheless, the court proceeded with an analysis of the benefit which the payment conferred on the seller and concluded that "where the payment for goods was made to the seller with instructions to disburse part of such funds to the buyer's agent, and where the agent assisted in bringing about the sale, the disbursement constituted monies expended for the bene-fit of the seller within the meaning of 19 U.S.C. § 1401a(b)." *Id.* at 1229. . We agree with this conclusion and also with the court's observation that concomitant benefit to the buyer does not detract from the benefit realized by the seller. *Id.* at 1228. Apart from DMZ's undisclosed role in facilitating this particular sale, CEC also benefited, even if slightly, from its temporary possession of the payment ultimately remitted to DMZ. The small "float" CEC enjoyed on this payment is no less significant to us than the additional duty owed on the payment itself is to Moss.

■ Finally, the payment here does not fall within either that group of items that specifically can be added to the price paid or payable pursuant to 19 U.S.C. § 1401a(b)(1) or those items specifically excludable from transaction value under section 1401a(b)(3). The statutory scheme for determining transaction value is relatively simple: subject to specifically enumerated additions and exclusions, an appraisal for duty purposes is based on the price paid for the merchandise to or for the benefit of the seller. This straightforward approach is no doubt intended to enhance the efficiency of Customs' appraisal procedure; it would be frustrated were we to parse the statutory language in the manner, and require Customs to engage in the formidable fact-finding task, envisioned by Moss.

### Conclusion

The judgment of the Court of International Trade is affirmed.

AFFIRMED.