LIBBEY GLASS, DIVISION OF
OWENS–ILLINOIS, INC.,
Plaintiff,

v.

UNITED STATES, Defendant,

and

J.G. Durand International,
Party-in-Interest.

Court No. 84–03–00410.

United States Court of,
International Trade.

Feb. 13, 1990.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, Charles A. St. Charles and Wesley K. Caine (Arthur Smith, Sr. Atty., Libbey Glass Div. of Owens–Illinois, Inc., of counsel), for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch, U.S. Dept. of Justice, Barbara M. Epstein, for defendant.

Barnes, Richardson & Colburn, David O. Elliott, Karin M. Burke and Sandra Liss Friedman, for party-in-interest.

## OPINION

AQUILINO, Judge.

This action, brought pursuant to 28 U.S.C. § 1581(b) and § 2631(b), challenges that part of T.D. 83–154, 17 Cust. B. & Dec. 332, 340 (1983), which denied a petition by the plaintiff domestic manufacturer of glass beverageware to reclassify under items 546.52 through 546.68 of the Tariff Schedules of the United States (TSUS) "Artic Stemware" and "Artic Tumblers" imported from France.

The stemware entered *sub nom.* "Champagne", "Wine" and "Goblet", while the tumblers were denominated "Old Fashioned", "Hi–Ball" and "Beverage". Upon entry, each was classified under item 546.-38, TSUS, which provided for:

> Glassware ... pressed and toughened (specially tempered), chiefly used for preparing, serving, or storing food or beverages, or food or beverage ingredients ...... 12.5% ad val.

The complaint alleges that the glasses should have been classified as "other" per TSUS item 546.52 ("Valued not over $0.30 each ...... 44% ad val.") or item 546.60 ("Valued over $0.30 but not over $3 each ...... 30% ad val.").

## I

Subsequent to trial of this action, Congress passed the Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, 102 Stat. 1107 *et seq.* Title I, Subtitle

B thereof provided for implementation of the Harmonized Tariff Schedule (HTS), effective January 1, 1989. *See id.*, § 1217(b), 102 Stat. at 1163, 19 U.S.C.A. § 3001 note (1989 Supp.). *See also* § 1213(b) (repealing section 201 of the Tariff Classification Act of 1962, Pub.L. No. 87–456, § 201, 76 Stat. 72, 74, which provided for publication of the TSUS).

The defendant has interposed a motion to dismiss the action as now moot, which is joined by the party-in-interest, according to the following argument:

The relief available to a prevailing plaintiff in this type of action is set out in 19 U.S.C. § 1516(f). Merchandise *entered after* the date of publication in the Federal Register of a decision adverse to the Government's position is to be classified, appraised, and assessed with duty in accordance with the final judicial decision. Even if this Court were to decide that the merchandise which is the subject of this action were properly classifiable under item 546.52 or 546.60, TSUS, as claimed by Libbey, that determination, assuming it were sustained following a possible appeal, would only have effect as to merchandise entered *after* publication in the Federal Register of notice of the court's decision.

Thus, the relief available under section 516 is prospective only, . . . and even if this Court were to determine that the merchandise at issue here were properly classifiable as claimed by Libbey, this Court could grant no relief.[1]

This is the view of the defendant, notwithstanding counsel's confirmation that, at the time this action commenced,

a clear controversy existed as to the correct classification *under the TSUS* of merchandise of the same class or kind as in the "test" entry.

During the period the TSUS was in force, the case here involved a justiciable controversy, *i.e.* the classification of merchandise of the same class or kind as that in the "test" entry, and a judicial decision affecting that class or kind of merchandise would clearly have been constitutional, although the decision would not affect any entry completed prior to the decision. There was real likelihood that there would be future entries which would be affected by the judgment of the court.[2]

In other words, according to the defendant, that "real likelihood" of a meaningful judgment in this action has been eliminated by the 1988 act.

However, in regard to entries of the merchandise at issue, those no longer in the future as well as those in that category, it is instructive to quote section 1211(d) of the omnibus act:

(d) CERTAIN PROTESTS AND PETITIONS UNDER THE CUSTOMS LAW.—

(1)(A) This subtitle may not be considered to divest the courts of jurisdiction over—

. . . . .

(ii) any petition by an American manufacturer, producer, or wholesaler under . . . 19 U.S.C. 1516[ ];

covering articles entered before the effective date of the Harmonized Tariff Schedule.

(B) Nothing in this subtitle shall affect the jurisdiction of the courts with respect to articles entered after the effective date of the Harmonized Tariff Schedule.

(2)(A) If any protest or petition referred to in paragraph (1)(A) is sustained in whole or in part by a final judicial decision, the entries subject to that protest or petition and made before the effective date of the Harmonized Tariff Schedule shall be liquidated or reliquidated, as appropriate, in accordance with such final judicial decision under the old Schedules.

---

1. Defendant's Memorandum in Support of Motion to Dismiss this Case on Ground of Mootness, pp. 3–5 (emphasis in original, footnotes and citations omitted).

2. Defendant's Reply to Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss this Case on Ground of Mootness ["Defendant's Reply"], p. 8 (emphasis in original). *See* Durand's Reply to Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss, p. 1.

(B) At the earliest practicable date after the effective date of the Harmonized Tariff Schedule, the Commission shall initiate an investigation under ... 19 U.S.C. 1332[] of those final judicial decisions referred to in subparagraph (A) that—

(i) are published during the 2–year period beginning on February 1, 1988; and

(ii) would have affected tariff treatment if they had been published during the period of the conversion of the old Schedules into the format of the Convention.

No later than September 1, 1990, the Commission shall report the results of the investigation to the President, the Committee on Ways and Means, and the Committee on Finance, and shall recommend those changes to the Harmonized Tariff Schedule that the Commission would have recommended if the final decisions concerned had been made before the conversion into the format of the Convention occurred.

(3) The President shall review all changes recommended by the Commission under paragraph (2)(B) and shall, as soon as practicable, proclaim such of those changes, if any, which he decides are necessary or appropriate to conform such Schedule to the final judicial decisions. Any such change shall be effective with respect to—

(A) entries made on or after the date of such proclamation; and

(B) entries made on or after the effective date of the Harmonized Tariff Schedule if, notwithstanding ... 19 U.S.C. 1514[], application for liquidation or reliquidation thereof is made by the importer to the customs officer concerned within 180 days after the effective date of such proclamation.

(4) If any protest or petition referred to in paragraph (1)(A) is not sustained in whole or in part by a final judicial decision, the entries subject to that petition or protest and made before the effective date of the Harmonized Tariff Schedule shall be liquidated or reliquidated, as appropriate, in accordance with the final judicial decision under the old Schedules.

102 Stat. at 1154–55.

■ On its face, this statute does not lend much support to defendant's motion. The claim that plaintiff's reliance thereon is "completely misplaced ... inasmuch as its petition does not cover articles entered prior to the effective date of the HTSUS"[3], citing subsection 1211(d)(1)(A)(ii), is off the mark. The existence of entries subsequent to commencement of this action and to trial (and prior to January 1, 1989) is all but a given. Rather, defendant's better point is that affirmative relief in an action such as this is prospective the grant thereof, citing, for example, *National Corn Growers Association v. Baker*, 840 F.2d 1547, 1554 (Fed.Cir.1988), and *National Corn Growers Association v. Von Raab*, 10 CIT 762, 764, 768, 650 F.Supp. 1007, 1009, 1012 (1986), *aff'd*, 814 F.2d 651 (Fed.Cir.1987), and since that moment has not yet arrived herein, while the HTS has, this matter is now moot.

However, as discussed in part II of this opinion, this action focuses on the meaning of "toughened (specially tempered)" in item 546.38, TSUS, *supra*, which terminology was also found in TSUS item 544.31 (covering flat safety glass). While the party-in-interest points out that the terminology has not survived for flat glass in the HTS, "toughened (specially tempered)" still applies to glass beverageware per the new Schedule's subheading 7013.29.05.

The defendant relies on *Allen Sugar Company v. Brady*, 13 CIT ——, 706 F.Supp. 49 (1989), which involved a petition filed with Customs pursuant to 19 U.S.C. § 1516, contesting classification of blended sweetener products from edible preparations containing sugar. Before any action thereon by the Service, the HTS went into effect, whereupon the government moved to dismiss for lack of jurisdiction on the ground of failure to exhaust administrative remedies. The court granted the motion. In doing so, it also pointed out that HTS

---

**3.** Defendant's Reply at 7, n. 8.

classification implicated an "entirely different law":

> ... [T]he question of classification under the TSUS is not germane to the question of classification under the HTSUS in this circumstance.
>
> ... [I]tem 1701.99.00, HTSUS, is under the auspices of different guidelines which employ a different means of characterizing the merchandise. The present guideline, General Rule of Interpretation 3(b), states that the "essential character" of a blend will be the basis of its classification, rather than the product's "chief use," which was the basis under the headnote to repealed item 183.05, Schedule 1, Part 15, Subpart B, Headnote 3, TSUS. 13 CIT at ——, 706 F.Supp. at 53.

The same cannot be said of the classification in controversy here. Thus, the court is unable to conclude that this action does not lie within the zone of protection provided by section 1211(d) of the 1988 omnibus act, *supra.* Neither the defendant nor the party-in-interest points to a contrary congressional intent. *Cf.* H.R.Rep. No. 576, 100th Cong., 2d Sess. 549–50 (1988):

> In light of the significant number and nature of changes in nomenclature from the TSUS to the HTS, decisions by the Customs Service and the courts interpreting nomenclature under the TSUS are not to be deemed dispositive in interpreting the HTS. Nevertheless, on a case-by-case basis prior decisions should be considered instructive in interpreting the HTS, particularly where the nomenclature previously interpreted in those decisions remains unchanged and no dissimilar interpretation is required by the text of the HTS.

In short, it is not clear that this action has become moot. The issue presented still lives, and the parties have a continuing, cognizable interest in its outcome. *Cf. Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 1950, 23 L.Ed.2d 491 (1969); *Murphy v. Hunt*, 455 U.S. 478, 481, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982). Defendant's motion to dismiss for mootness is therefore denied.

## II

Section 2639(a)(1) of title 28, U.S.C. provides that, in actions such as this, the decision at issue "is presumed to be correct" and the "burden of proving otherwise shall rest upon the party challenging such decision."

## A

In attempting to bear its burden, the plaintiff takes the position that Congress intended that "toughened (specially tempered)" beverageware under TSUS item 546.38 disintegrate into "small rounded-edge pieces" when broken. Since, in its view, the glasses at issue did not fracture that way when tested, they were improperly classified.

In *Guardian Industries Corp. v. United States*, 3 CIT 9, 10–11, 1982 WL 2209 (1982), an action challenging classification under item 544.31 of flat pieces of tempered glass for use in patio doors, the court compared annealing with tempering as follows:

> ... Whereas annealing involves *gradual* cooling of the glass, tempering is accomplished by heating the glass to approximately 1200° Fahrenheit and then *rapidly* cooling the surface. In the tempering process, the outside of the glass cools faster than the inside and this differential cooling rate ultimately results in a difference in the stresses in the core of the glass and those on the outside surface or "skin" of the glass. By rapid cooling, the surface of the glass is locked into a state of high compression and the inside central portion or core is locked in compensating tension. These stresses or strains created by the differential cooling of the surfaces and core of the glass give the glass significant added strength to the extent that the tempered glass has three to four times more resistance to impact than annealed glass.... In addition, tempering changes the fracture characteristics of the glass upon breakage. Accordingly, while annealed glass will break into large irregular pieces with sharp jagged ends, tempered glass

will shatter into many small and relatively harmless slivers, pieces or cubes, hence making it much safer to use. [emphasis in original, footnote omitted]

Evidence presented at trial herein showed that annealed glass is glass without stress. *E.g.*, Tr. at 66, 820, 886. Plaintiff's exhibit 62 states that the purposes of annealing glass are

> to reduce residual stresses and to modify structure.... The process involves raising the glass body to the annealing temperature as defined by the annealing point, maintaining this temperature for a time sufficient to relieve existing stresses and to stabilize the glass, and then cooling the glass at a rate sufficiently slow that residual stresses will not reappear when the glass temperature has reached equilibrium.[4]

The same exhibit states that tempering is a heat-treatment process which is

> intended to raise the values of the residual stresses rather than to lower them as in the case of annealing. The purpose of tempering is to increase the mechanical strength of glass. Therefore, the distribution of the residual stresses, or the stress pattern, becomes a matter of great importance....
>
> In this process the temperature of the glass is raised to a value in the neighborhood of the softening point. It is then removed from the heating furnace, and the surfaces are quickly chilled.[5]

In this action, the glass is soda-lime and is not flat and uniform in thickness but rather pressed into essentially cylindrical shapes enclosed at the bottoms and of decreasing thicknesses therefrom to the top rims.[6] Immediately recognizable as beverageware, the configurations of the six pieces under review are markedly more complex than flat pieces of glass.

Tempering of flat glass is achieved by heating it to the necessary temperature and then rapidly cooling its surfaces, generally by passing jets of compressed air over them. Jets of air were also used to cool the Durand merchandise. However, as stated, the surfaces of that glass are hardly parallel and are pressed into essentially cylindrical shapes, ranging in diameter at the mouths from approximately 2¾ to 3½ inches and in depth from 1⅞ to 5⅛ inches [7]. Evidence adduced at trial indicated, and the court finds, that uniform tempering of the six glasses, with their varying wall thicknesses and configurations, was all but beyond technological capability [8], at least on a commercially-feasible basis.

Uniform tempering of flat glass results in surface compression of at least 10,000 pounds per square inch. McLellan & Shand, Glass Engineering Handbook, p. 12–2 (3rd ed. 1984), citing 16 C.F.R. part 1201 (Consumer Product Safety Comm'n Standard for Architectural Glazing Materials). That standard prescribes the safety requirements for materials used in any of the following architectural products: (1) storm doors or combination doors, (2) doors, (3) bathtub doors and enclosures, (4) shower doors and enclosures, and (6) [9] sliding glass doors (patio-type). When glass for these applications is tempered to such a degree, it disintegrates into the small, rounded-edge pieces contemplated by TSUS item 544.31 when its surface is subjected, for example, to striking with a center

---

4. McLellan & Shand, Glass Engineering Handbook, p. 4–4 (3rd ed. 1984).

5. *Id.* at 4–7.

6. The bottoms of the three tumblers [plaintiff's Exs. 16A, 16E and 16F], in particular, are significantly thicker. As indicated by its nomenclature, the stemware at issue herein, namely, "Champagne" [plaintiff's Ex. 16B], "Wine" [Ex. 16C] and "Goblet" [Ex. 16D], entails mounting of the cylindrical containers on glass stems fused to circular glass bases.

7. The court has taken these measurements from plaintiff's exhibits 16B, 16E, 16A and 16B, respectively.

8. Diameter and depth, for example, affect ability to introduce air at the mouth to quench inside surfaces and then to exhaust it quickly. *Cf.* Tr. at 221–22, 867–68.

9. Subsection (5) of 16 C.F.R. § 1201.1(a) has been revoked and reserved. *See* 45 Fed.Reg. 57,383 (Aug. 28, 1980).

punch.[10]

Both Customs and the plaintiff tested the Durand beverageware in this manner. This testing showed, and the court finds, that the six glasses "do not break into a large number of small, round-edged pieces without the presence of any shards", to quote from the Service's determination [11], T.D. 83–154, 17 Cust. B. & Dec. at 339. The plaintiff states:

Although this fact is not in controversy, Libbey does not rely on Customs' finding alone to establish that the six items do not disintegrate into small rounded-edged pieces. Rather, this conclusion is inescapable upon visual inspection of the actual broken specimens admitted into evidence at trial, including: the specimens referred to by Customs in its determination, Defendant's Ex. E; those used in the fragmentation tests of Libbey, Pl.Ex. 31; those used by Anchor Hocking, Pl.Ex. 32; and those used by American Glass Research (AGR), Pl.Ex. 34(a).

Complementing visual inspection are the reports of Libbey, Anchor Hocking, and AGR which evaluate the fragments in terms of objective size and weight criteria: Pl.Exs. 23(a)-(b), 24(a)-(c) and 25, respectively. Reports by plaintiff's experts applying similar objective criteria to Customs' specimens are set forth at Pl.Exs. 75(a) and 75(b). In addition to results on the six items as purchased in the marketplace, Anchor Hocking's test reports include breakage results for the six items which it retempered and for one Anchor Hocking item which it tempered for purposes of these tests. AGR's report includes, in addition to breakage results, residual stress readings for the six items obtained by use of a polarizing microscope.[12]

In other words, the "parties to this action agree that the six articles at bar do not completely dice" [13], which fact was amply demonstrated at trial.

B

Thus, the dispositive question remains the meaning of "toughened (specially tempered)", as used in TSUS item 546.38. Again, however, there is substantial agreement among the parties, to wit, that the Durand glasses are toughened and that they are tempered. Plaintiff's disagreement focuses on the word specially, which it seeks to equate with "highly". In turn, the plaintiff equates highly with a uniform surface compression of at least 10,000 psi. This position draws upon item 544.31, which was found in Subpart B of Part 3 to TSUS Schedule 5, covering "flat glass and

---

10. A center punch imparts a minimal amount of energy necessary to cause internal forces to fracture the glass. *See, e.g.,* Tr. at 88, 94.

11. Customs Internal Advice No. 76/136 [plaintiff's Ex. 5] directs that the testing be conducted as follows:

If the item is set on a solid surface and then broken by striking the inside center bottom or heel with a sharp center punch, the degree and uniformity of stress can frequently be determined. Strike the punch with a hammer, using blows of gradually increasing severity until breakage occurs.

The party-in-interest takes the position that this approach is for flat glass but that

the best overall test to determine when an item of glassware is specially tempered within the meaning of tariff item 546.38 is the thermal shock test. The three companies involved in this litigation which actually do produce fully tempered beverageware all employ the thermal shock test.... [It] is performed simply by heating the glassware product in an oven and then immediately plunging it into a bath of cold water. This has the effect of reversing the stresses which were put into the glass during the tempering process.... The ability of the product to withstand the hot-to-cold temperature differential without breakage is a reliable indicator of its durability, which is the undisputed purpose of tempering beverageware....

Post–Trial Brief for Party-in-Interest, pp. 52–53 (citations omitted).

This position has support in the record, but the court need not, and therefore does not, make a definitive finding as to the relative merits of the various testing methods. The court simply notes in passing that the Service also subjected the merchandise to a thermal shock test, as well as to "counter fall" and "stacking" tests. Tr. at 734.

12. Post Trial Brief on Behalf of Plaintiff, pp. 64–65 (footnotes omitted).

13. *Id.* at 64. Dicing was defined at trial as the fracturing of tempered glass into small cubical pieces. *See* Tr. at 405.

products thereof." To be within the ambit of that item, such glass had to be "[t]oughened (specially tempered)". The U.S. Tariff Commission's Tariff Classification Study of November 15, 1960 stated in support of this provision for that schedule (p. 137):

> Item 544.31 is a new provision. It covers specially tempered glass that is more resistant to shock than ordinarily tempered glass, and, when broken, disintegrates into small rounded-edge pieces, rendering it particularly adaptable to vehicle glazing. Somewhat lower in cost than laminated glass, it is extensively used as a substitute for laminated glass in the glazing of automobiles.

Item 546.38 was not accompanied by a similar explanatory note, but the plaintiff argues that Congress clearly intended to assign the same meaning to "toughened (specially tempered)" in both instances as the items are *in pari materia.*

On its part, defendant's summary of argument is as follows:

> Congress intended that *some* tempered glasses for serving beverages be classified under item 546.38, TSUS, as "toughened (specially tempered)" glassware, chiefly used for serving beverages. The six styles of the Durand beverage glasses at issue here are as highly tempered as any beverage glasses commercially produced. Therefore, the Durand glasses at issue were properly classified under TSUS item 546.38.[14]

While the party-in-interest does not disagree with defendant's ultimate position, Durand argues in support thereof (1) that TSUS items 544.31 and 546.38 are not *in pari materia* and therefore "toughened (specially tempered)" need not be interpreted the same way for both and (2) that that term in item 546.38 encompasses glass tableware articles that have been full-surface tempered for the special purpose of achiev-

ing a significantly greater degree of durability than ordinary annealed glass.

The court, after viewing the glass fragments and pieces produced at trial and considering the testimony of the witnesses thereon, finds each of the six glasses to be fully tempered, albeit to varying degrees from one point to another on each unit; at best, only certain sections of the glasses in question approached the degree of tempering advocated by the plaintiff. The result of the full tempering was to make each piece toughened overall[15]—in comparison with ordinary annealed or partially tempered[16] glasses, the commercial alternatives.

As recited above, item 544.31 was set forth in the Schedule 5 Tariff Classification Study of November 1960 for flat safety glass. By that time, the process for the full tempering of beverageware had been developed in France. Some two years later, Compagnie de Saint–Gobain recommended to the Tariff Commission a "breakout" from the Tariff Classification Act of 1962 for "[f]ully tempered table and kitchen glassware" upon a representation of "superiority over ordinary glass tableware" on the basis of durability. Plaintiff's Ex. 1. The word fully was suggested "to distinguish between glass, the entire surfac[e] of which is fully tempered, and that in which the temper is only partial." *Id.* Thereafter, the Commission's TCS Fifth Supplemental Report dated May 16, 1963 recommended (at page 37) adoption of item 546.38 per the following explanation:

> This provision will continue the existing rate treatment for the glassware in question. Such glassware is currently dutiable under paragraph 218(g), Tariff Act of 1930.

Obviously, this explanation did not tie the merchandise to its characteristics upon fracture, as did the earlier explanation for flat glass under item 544.31. Indeed, the

---

**14.** Defendant's Brief, pp. 18–19 (emphasis in original).

**15.** The court notes in passing that testimony at trial indicated that tempering beverageware too highly can make it too prone to fracture to be of utility. *See, e.g.,* Tr. at 284, 327, 494–95.

**16.** The rims, for example, of some beverageware are tempered in order to toughen that area, which is often the most fragile.

implication was that the new product simply belonged in the old Tariff Act category referenced. Be that as it may, the recommendation was accepted by Congress and the President as stated, which, at the time, applied in essence only to the Saint–Gobain glassware. It was not tempered to the degree the plaintiff now proffers[17], just as the comparable Durand merchandise now is not. But that beverageware is the most highly tempered on the market, a fact the plaintiff domestic manufacturer's own witnesses admitted. *See, e.g.,* Tr. at 330, 353, 490, 491, 493.

■ The court finds that the clear purpose of this tempering is durability, whereas safety is clearly the primary goal of tempering large and inherently dangerous pieces of flat glass for automobiles and buildings. The products are not analogous, and, although safety is always a concern, the Durand merchandise was not proven at trial to be particularly dangerous upon breakage. Moreover, annealed beverageware, which expectedly fractures into sharp pieces, has not been considered unsafe for use.

Although item 544.31 and item 546.38 ultimately became law at the same time,[18] the derivation and context of each were different. As the courts have stated,

the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.

*Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). *See, e.g., Madison Galleries, Ltd. v. United States,* 870 F.2d 627, 629–30 (Fed.Cir. 1989); *Moss Manufacturing Co. v. United States,* 13 CIT ——, ——, 714 F.Supp. 1223, 1227 (1989), *affirmed,* 896 F.2d 535 (Fed. Cir.1989). Following this "familiar canon of statutory construction", this court is unable to discern a clearly expressed legislative intention that the Customs Service apply item 546.38, TSUS other than occurred in this matter. The explanatory note accompanying item 544.31 was not expressly applicable to the later provision. On its face, that item, 546.38, contemplated that glassware within its purview be toughened, in particular by tempering, to increase resistance to mechanical and thermal shock. Toughening by some other means is not within the meaning of the item, nor is plaintiff's proposition that "specially" means "highly", notwithstanding the evidence showing the Durand merchandise to have the highest degree of tempering available.

In classifying this merchandise under item 546.38, Customs conducted tests ranging in sophistication from studying the fragments caused by center-punch destruction of the glasses—to thermal shock—to simply dropping them on the floor. The evidence presented at trial did not overcome the presumption of correctness of the Service's decision based on the results of those tests. That is, Customs determined that the glass was toughened by special tempering.

Judgment must therefore enter in favor of the defendant.

---

**17.** *Cf.* Tr. 998–99.

**18.** *Cf.* Proclamation No. 3548, 28 Fed.Reg. 9,279 (Aug. 23, 1963).