**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Gary TIPTON, Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Edward PURMORT, Defendant–
Appellant.**

Nos. 94–50201, 94–50210.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 10, 1995.

Decided May 24, 1995.

As Amended on Denial of Rehearing
and Rejection of Suggestion for
Rehearing En Banc
July 21, 1995.*

---

* Judge Noonan would grant the petitions for rehearing and accept the suggestions for rehearing en banc.

Roger S. Hanson, Santa Ana, CA, for defendant-appellant Tipton.

David J. Macher, La Habra, CA, for defendant-appellant Purmort.

Michael Terrell, Asst. U.S. Atty., Los Angeles, CA, for plaintiff-appellee.

Before: CANBY, and NOONAN, Circuit Judges, and KING,[**] District Judge.

Opinion by Judge CANBY; Dissent by Judge NOONAN.

CANBY, Circuit Judge:

Gary Tipton and Edward Eugene Purmort appeal their convictions for conspiracy to structure financial transactions in violation of 18 U.S.C. § 371 and for structuring a financial transaction in violation of 31 U.S.C. § 5324(a)(3). We affirm.

### I.

At trial, the government presented evidence establishing the following facts: In late 1987, Ahd Haddad and his wife Christine Haddad opened a business account for their "Stereo and Video Stop" store at the Loma Linda branch of Security Pacific National Bank. At the time, Tipton was the operations manager of the bank and Purmort was the bank's branch manager.

Both Tipton and Purmort participated in quarterly training sessions of bank employees. At the training sessions, employees learned that if a person came to the bank to buy cashier's checks with more than $10,000 dollars in currency on a single day, a Currency Transaction Report (CTR) would have to be filed with the Internal Revenue Service (IRS). Employees also learned that if a husband and wife had a joint account and

[**] The Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

came in with more than $10,000 dollars on a single day, a CTR would have to be filed. Tipton and Purmort both testified that in 1988, they were familiar with regulations concerning reporting of currency transactions and knew that it was illegal to structure a financial transaction in order to avoid reporting requirements.

In March, 1988, Ahd Haddad asked Tipton how he could avoid reporting his cash income to the IRS. Tipton told him that as long as he kept his deposits under $10,000, the bank did not have to file a CTR with the IRS. In June of 1988, the Haddads came into the bank with approximately $45,000 in cash with which they wished to purchase cashier's checks to pay their inventory supplier. They were sent into a conference room with Tipton and Purmort. Purmort left the room twice, then came back into the room as the Haddads and Tipton were counting the cash and whispered to Ahd Haddad, "[y]ou're going to keep bringing this much cash, you are going to get the IRS after our asses." The cash was then used to purchase four cashier's checks, each for less than $10,000, and each of which Tipton signed on behalf of the bank. Because Tipton told Ahd Haddad to try to limit his visits to the bank as they were nervous about him coming too often, he purchased another cashier's check from a different bank to cover the remainder of the invoice. At some point in Ahd Haddad's dealings with the bank, Tipton also told him that he should use different names when purchasing cashier's checks.

In September, 1988, Ahd and Christine Haddad entered the bank with $80,000 in cash. They told Tipton that they wanted to purchase cashier's checks made out to an escrow company to be used toward the purchase of land, but they did not want their transactions reported to the IRS. Tipton suggested that they divide the $80,000 into eight deposits in the amounts of $10,000 or less. On four successive days in September, the Haddads each brought $10,000 into the

bank and bought separate cashier's checks made out to the escrow company. Tipton signed for most of these checks, and Purmort told an employee to approve two of them. The bank did not file CTRs for any of the transactions.

One bank employee testified that, because she and her supervisor were concerned about the fact that CTRs weren't filed in connection with the Haddads' purchase of the eight cashiers checks, they requested photocopies and debit offsets of the cashier's checks. When the documentation arrived at the bank, the employee heard Tipton ask her supervisor "are you trying to burn me?" Another bank employee testified that in 1989, he heard Purmort tell Tipton that Purmort was going to deny having any knowledge of "what was going on" with the Haddads to the IRS agents who were investigating the Haddads.

In August, 1993, a federal grand jury returned a two-count indictment against Ahd Haddad, Christine Haddad, Tipton, and Purmort, charging them with conspiracy to structure financial transactions in violation of 18 U.S.C. § 371 [1] and with structuring the $80,000 transaction for the purpose of evading currency reporting requirements in violation of 31 U.S.C. § 5324(a)(3).[2] The Haddads pleaded guilty, and Ahd Haddad agreed to testify against Tipton and Purmort. At the close of the trial, the district judge instructed the jury that in order to sustain its burden of proof for the crime of structuring financial transactions, the government was required to prove beyond a reasonable doubt

> *First:* That the defendant knew of the reporting requirements, that is, that he knew that a Currency Transaction Report was required to be filed for any currency transaction over $10,000; *Second:* That the defendant knowingly structured or assisted in structuring or attempted to structure or assist in structuring a currency transaction with one or more domestic financial institutions for the purpose of

---

1. 18 U.S.C. § 371 provides a punishment for conspiracy to "commit any offense against the United States."

2. 31 U.S.C. § 5324(a)(3), states that

> No person shall for the purpose of evading the reporting requirements [of specified sections of the United States Code or related regulations] ... structure or assist in structuring ... any transaction with one or more domestic financial institutions.

evading the reporting requirements; and *Third:* That the defendant acted with knowledge that the structuring he undertook was unlawful.

After deliberating for a day, the jury found Tipton and Purmort guilty both of conspiracy to structure a financial transaction and of structuring a financial transaction. Tipton and Purmort appeal their convictions on several grounds.

## II.

### A. Jury Instructions

■ The district court did not err in instructing the jury on the elements the government was required to prove in order to convict Tipton and Purmort of assisting the Haddads in unlawfully structuring a financial transaction. The district court instructed the jury that the government was required to prove that (1) Tipton and Purmort knew of the relevant reporting requirements, (2) Tipton and Purmort knowingly assisted the Haddads in structuring their purchase of $80,000 worth of cashier's checks for the purpose of evading those reporting requirements, and (3) Tipton and Purmort knew that the structuring they assisted in undertaking was unlawful. Purmort argues that to prove defendants acted willfully, the government was also required to prove that the structuring was done for a nefarious purpose. We reject this argument. To prove that defendants acted willfully, the government was only required to prove that Tipton and Purmort knew that they were assisting the Haddads in structuring to avoid reporting requirements, and that this structuring was unlawful. *See Ratzlaf v. United States,* —— U.S. ——, ——, 114 S.Ct. 655, 663, 126 L.Ed.2d 615 (1994); *United States v. Hove,* 52 F.3d 233, 235–36 (in order to establish that defendant was guilty of willfully structuring currency transactions "the government had to prove, and the jury had to be instructed, that [defendant] knew that the structuring he undertook was unlawful") (9th Cir.1995). *United States v. Weitzenhoff,* 35 F.3d 1275, 1285 (9th Cir.1993) (*as amended* August 8, 1994), *cert. denied sub nom. Mariani v. United States,* —— U.S. ——, 115 S.Ct. 939, 130 L.Ed.2d 884 (1995) (noting that in *Ratzlaf,* the Court "construed the term 'willfully' in the anti-structuring provisions of the Bank Secrecy Act to require both that the defendant knew he was structuring transactions to avoid reporting requirements and that he knew his acts were unlawful.").

### B. Sufficiency of the Evidence

■ Both Tipton and Purmort argue that the government did not present sufficient evidence of their knowledge that the structuring they undertook was unlawful. In deciding whether there is sufficient evidence to support a conviction, we review the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Lennick,* 18 F.3d 814, 818 (9th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 162, 130 L.Ed.2d 100 (1994). We conclude that the government presented sufficient evidence that Tipton and Purmort knew that the structuring they undertook was unlawful.

As the First Circuit recognized in a recent post-*Ratzlaf* structuring case, "willfulness, as a state of mind, can rarely be proved by [direct evidence that the defendant knew of the illegality of structuring]; instead, it is usually established by drawing reasonable inferences from the available facts." *United States v. Marder,* 48 F.3d 564, 574 (1st Cir. 1995) (internal quotations and citations omitted). Thus in *Marder,* the court affirmed a conviction for structuring despite a lack of direct evidence that the defendant knew that structuring was illegal. The court reasoned that the jury could infer from the fact that the defendant had his wife make cash transactions at three separate banks that the defendant was trying to conceal his structuring, and from that inference could infer that the defendant knew that the structuring was unlawful. The First Circuit's approach is in accord with *Ratzlaf,* in which the Supreme Court noted that "[a] jury may . . . find the requisite knowledge [that the structuring was unlawful] on defendant's part by drawing reasonable inferences from the evidence of

defendant's conduct...." *Ratzlaf,* — U.S. at — n. 19, 114 S.Ct. at 663 n. 19. Thus the jury could consider circumstantial evidence in determining whether Tipton and Purmort knew that the structuring in which they assisted was unlawful.

The government introduced sufficient circumstantial evidence at trial to prove beyond a reasonable doubt that Tipton and Purmort knew that assisting the Haddads in dividing up their $80,000 purchase of cashier's checks to avoid having the bank file a CTR was unlawful. The government introduced evidence that Tipton and Purmort participated in training sessions covering regulations regarding reporting requirements, and both Tipton and Purmort testified that in 1988 they knew it was illegal to structure financial transactions in order to avoid reporting requirements. In the context of convictions for willful failure to file federal income tax returns, we have held that evidence of the defendant's knowledge of his or her general obligation to file tax returns can support a jury's inference that the defendant knew that he or she violated the law in the failure to file a tax return for which he or she is charged. *United States v. Poschwatta,* 829 F.2d 1477, 1481 (9th Cir.1987), *cert. denied,* 484 U.S. 1064, 108 S.Ct. 1024, 98 L.Ed.2d 989 (1988) (evidence that the defendant knew the possible criminal penalties for failure to file tax returns tends to show that the defendant acted willfully in the failure to file tax returns for which he is charged); *United States v. Sullivan,* 369 F.Supp. 568, 568–69 (D.Mont.1974) (where defendant was certified public accountant who failed to file tax returns for several years, there was sufficient evidence from which jury could infer that defendant's failure to file was willful despite a lack of evidence that the defendant was attempting to conceal his income). In this case, the jury could infer from evidence that Tipton and Purmort generally knew what structuring was—and that it was illegal—and that Tipton and Purmort knew it was illegal to assist the Haddads in dividing up their $80,000 transaction to avoid having a CTR filed.

The government introduced other circumstantial evidence that Tipton and Purmort knew that assisting the Haddads in avoiding reporting requirements was illegal. Purmort's comment to Ahd Haddad that "[y]ou're going to keep bringing this much cash, you are going to get the IRS after our asses" tends to show that he realized the IRS would have a problem with a cash transaction of over $40,000 being made without a CTR being filed. The fact that Tipton told Ahd Haddad to limit his visits to the bank, and that Tipton told him to use different people's names when purchasing cashier's checks, also suggests that Tipton knew that there was something unlawful about the way in which the Haddads were purchasing cashier's checks. In addition, the fact that Tipton asked a co-worker who received photocopies of debit offsets for the eight cashier's checks whether she was trying to "burn" him creates an inference that he knew he might be in trouble for having assisted in the transaction at issue. Finally, the fact that Purmort told Tipton that Purmort would deny to investigators that he knew "what was going on" with the Haddads suggests that he knew that he should not have facilitated the Haddads' structuring of their $80,000 transaction.

Some of Tipton and Purmort's respective statements suggest that the two were not only aware that there was something wrong with the Haddads' manner of purchasing cashier's checks, but also are evidence that they wished to conceal information about their involvement with the Haddads. Purmort's statement that he would deny knowledge of the Haddads' affairs is evidence of willfulness. *See United States v. Marabelles,* 724 F.2d 1374, 1379–80 (9th Cir.1984) (fact that defendant lied to IRS agents about his tax record-keeping was evidence that he willfully attempted to evade taxes). Tipton's request that the Haddads limit their visits to the bank, and his request that Ahd Haddad use different persons' names when purchasing cashier's checks, also suggests that Tipton was trying to draw attention away from their actions. In the context of prosecution for attempted tax evasion, we have held that evidence of attempts to conceal pertinent information can be treated as circumstantial evidence that a defendant knew he or she was violating the law. *Id.* at 1377. In this

case, the jury could have treated evidence that Tipton and Purmort wished to reduce the risk that the IRS would discover their dealings with the Haddads as circumstantial evidence that the two were aware that they were violating the law.

We conclude that the government presented sufficient evidence that Tipton and Purmort knew that assisting the Haddads in structuring their $80,000 transaction was illegal to support their convictions.

### C. Remaining Issues

Tipton and Purmort both attack the district court proceedings on a variety of other grounds, including challenges to the admission or exclusion of evidence at trial. None of these challenges is meritorious.

AFFIRMED.

NOONAN, Circuit Judge, dissenting:

The statute governing this case is 31 U.S.C. § 5324(a)(3), which provides:

> No person shall for the purpose of evading the reporting requirements of section 5313(a) or 5325 or any regulation prescribed under any such section
>
> . . . . .
>
> (3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.

The statutory crossreference to § 5325 does not appear to be relevant here. The statutory crossreference to § 5313 is to authorization of the Secretary of the Treasury to prescribe the reporting of certain monetary transactions by financial institutions; under the authority of this statute, the Secretary has prescribed the reporting of transactions in currency of more than $10,000. 31 C.F.R. § 103.22(a)(1). The regulations specify:

> Multiple currency transactions shall be treated as a single transaction if the financial institution has knowledge that they are by or on behalf of any person and result in either cash in or cash out totalling more than $10,000 during any one business day. *Id.*

The Supreme Court has authoritatively construed the statute in *Ratzlaf v. United States,* —— U.S. ——, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994). The holding of this case is that for a defendant to be guilty of violating § 5324(a)(3), "the jury had to find he knew the structuring in which he engaged was unlawful." *Id.* at ——, 114 S.Ct. at 663. The reasoning that leads to this conclusion makes clear that it is not enough to establish guilt to prove that the defendant knew "that a financial institution must report currency transactions in excess of $10,000 and his intention to avoid such reporting." *Id.* at ——, 114 S.Ct. at 657. It must be proved that the defendant's conduct was "willful," i.e., that "he was aware of the illegality of the 'structuring' in which he engaged." *Id.* It must be shown that he "knew the structuring he undertook was unlawful." *Id.* at ——, 114 S.Ct. at 658. It is not enough that, as in *Ratzlaf,* the defendant "admits that he structured cash transactions, and that he did so with knowledge of, and a purpose to avoid, the bank's duty to report currency transactions in excess of $10,000." *Id.* at ——, 114 S.Ct. at 659. There must be "a 'specific intent to commit the crime,' i.e. 'a purpose to disobey the law.'" *Id.* There must be proof, as the Supreme Court quotes the First Circuit, of a "bad purpose. to disobey the law." *Id.*

In the course of its reasoning the Supreme Court observed that "structuring" of financial transactions was not in itself evil and that structuring a transaction to avoid a tax was legitimate. *Id.* at ——, 114 S.Ct. at 661–662. The Supreme Court further observed that the principal purpose of the statute was to give federal agencies additional tools to investigate and curb money laundering "'by which criminals have successfully disguised the nature and source of funds from their illegal enterprises.'" *Id.* at ——, n. 11, 114 S.Ct. at 661, n. 11, quoting S.Rep. No. 94–443, pp. 1–2 (1986).

*Ratzlaf* may be read as though it did not really mean what it said when it declared that the prosecution must show that the defendant "knew the structuring in which he was engaged was unlawful." *Ratzlaf,* —— U.S. at ——, 114 S.Ct. at 663. In other

words, it may be read as requiring a ritual of recital to the jury of an instruction that the defendant must have acted wilfully but as not requiring any proof of such willfulness in the strong sense defined by the Court. In effect, although not in words, that is what the majority does. Without evidence showing beyond a reasonable doubt that Tipton and Purmort knew that the particular actions in which they engaged constituted illegal structuring, the majority upholds their convictions.

We all agree that the defendants here, like Ratzlaf, knew that there was a law against the structuring of bank deposits and that therefore structuring as defined by the statute was unlawful. We also agree that Haddad wanted to keep his cash transactions secret, either from fear of the Syrian government or from fear of the IRS. We all agree that the defendants here, like Ratzlaf, wanted to avoid a report of the transactions. The question is whether Tipton and Purmort knew that the transactions they engaged in in September 1988 constituted unlawful structuring.

As proof of their knowledge, the majority opinion cites these facts:

1. That Purmort in June 1988 told Haddad that if he kept on bringing in this much cash, he would "get the IRS after our asses."

2. That at some point in the summer of 1988 Tipton told Haddad to limit his visits to the bank.

3. That, according to Haddad, Tipton told him to use different people's names when purchasing cashier's checks, "not just my name come up, but different people."

4. That, after all of the September 1988 transactions were completed, other bank employees obtained photocopies of the cashier's checks and Tipton asked one of them, "Are you trying to frame me"?

5. That Purmort told Tipton that Purmort would deny to investigators that he knew what was going on with the Haddads.

The quoted language from Purmort to Haddad in June expresses colloquially the idea that if the bank handled large cash transactions the IRS would go after the peo-

ple with the cash. It does not amount to any evidence of specific intent on Purmort's part to break the law. If anything, it shows a desire not to be associated with lawbreaking. Similarly the comments to Haddad to limit his visits shows an intent not to break the law. The recommendation to Haddad to have "different people" buy cashier's checks is as consistent with an intent to keep Haddad technically within the law as it is with a bad purpose to break the law. It is not a crime for a person with a cash business to want to keep the extent of his cash business from the knowledge of the IRS and manage his bank deposits to achieve that result. *Ratzlaf v. United States,* —— U.S. —— at ——, 114 S.Ct. 655 at 661 (1994) (semble). The statute the bankers are charged with violating is not a statute that makes it a crime to keep a taxpayer's cash income from knowledge of the IRS and to arrange banking transactions with that end in view. It is startling, to say the least, that the government's brief treats Tipton's early 1988 advice to Haddad "to keep his cash transactions below $10,000, so no filing would have to be made to the IRS" as advice to Haddad "to structure his cash transactions." Appellee's Brief, p. 5. Plainly, the government uses the verb "structure" to describe what the government views as criminal conduct. It is the same position that the government brief took in *Ratzlaf* and that the Supreme Court implicitly repudiated.

The other evidence relied on by the majority opinion is evidence of nervousness after the event. Knowing that there was a law against structuring, the bankers could reasonably be nervous when other bank employees questioned what they had done and an investigation was begun. Understandable later nervousness cannot be retroactively converted into proof of specific intent to violate the statute.

We all agree as to the standard of evidence set by *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560 (1978): the evidence must be looked at from the government's perspective, and we must then ask whether any reasonable juror could find the defendants guilty beyond a reasonable doubt. What is sometimes forgotten in

applying this standard is that, while we adopt the government's perspective, we must still ask whether there is proof beyond a reasonable doubt. If adoption of the government's perspective means the resolution of all doubts in favor of the government, the effect is to eliminate reasonable doubt from the review and to substitute in its place the presumption that the defendant is guilty, a presumption rebuttable only by the defendant producing unimpeachable evidence of his innocence. Such a way of reasoning appears to be what drives the majority opinion to its conclusion of affirmance. It does not appear to me to be consistent with a standard requiring proof beyond a reasonable doubt of each element of the crime charged.

On the basis of the evidence set out in the majority opinion, I find it very difficult to believe that any reasonable person could find the evidence showed that Purmort and Tipton, beyond a reasonable doubt, knew that the particular transactions they entered into with the Haddads were unlawful structuring. Setting aside their own testimony that they did not know the transactions to be unlawful, we are still confronted with the fact that they openly carried out the transactions in a bank with the knowledge of a substantial number of the bank's employees; they made no attempt to hide these transactions from them; and the regulations of the Secretary, remarkably detailed as they are on many points, do not declare that a husband and wife's cash deposits on a given date must be consolidated for purposes of a report. Proof of the defendants' willfulness, specific intent to break the law, bad purpose is simply not there beyond a reasonable doubt.

I respectfully disagree.